# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-07-00651-CR
NO. 03-07-00652-CR
NO. 03-07-00653-CR

**Dennis Alexander, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 403RD JUDICIAL DISTRICT**
**NOS. D-1-DC-06-301753, D-1-DC-06-301777 & D-1-DC-06-301778,**
**HONORABLE MARK R. LUITJEN, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

These three cause numbers were consolidated for trial. In cause number 06-301753, a jury found appellant Dennis Alexander guilty of theft of a motorcycle. *See* Tex. Penal Code Ann. § 31.03 (West Supp. 2008). In cause number 06-301777, the jury found Alexander guilty of theft of a motor vehicle. *See id.* In cause number 06-301778, the jury found Alexander guilty of placing a serial number on a vehicle with the intent to change the identity of the vehicle. *See* Tex. Transp. Code Ann. § 501.151 (West 2007). The trial court assessed punishment at ten years' imprisonment for each of the theft offenses and thirty-five years' imprisonment for the serial number offense. Alexander appeals, arguing that the evidence was legally and factually insufficient to support the serial number offense and that his trial counsel was ineffective for failing to move to quash the habitual offender portion of the serial number indictment. We hold that the evidence was

legally and factually sufficient to support the verdict and that Alexander was not prejudiced by ineffective assistance of trial counsel. We affirm the judgments of conviction.

**BACKGROUND**

On July 31, 2006, Detective John Spillers of the Austin Police Department received a phone call on the auto theft tip line. The caller told Detective Spillers that a man was advertising a 1990s model Volvo for sale as a 1980s model Volvo at 1812 Clifford Avenue in Austin, Texas. Detective Spillers and Detective Robert Hightower drove to the Clifford Avenue address—Alexander's home. In the back yard, they found a white 1990s model Volvo that matched the description given by the caller, a white box trailer, a green motorcycle, a Toyota, and a tow truck. Alexander told the officers that he ran a tow business and that he had recently towed the Volvo and the white box trailer and was storing them for customers. He told them that he owned the green motorcycle, the Toyota, and the tow truck.

The officers ran the license plate on the Volvo, and it came back as "no record." The Volvo had two different vehicle identification numbers (VINs). The VIN that was on the front dash plate and the engine compartment plate were from a 1980s model Volvo while the VIN on the driver's side door was the original and showed that the vehicle had been reported stolen in early July. The inspection sticker on the Volvo's windshield was from a Toyota. Officer Spillers testified that people typically switch VINs and inspection stickers on stolen vehicles "so they don't get caught by the police and they don't get pulled over on inspections."

The detectives next noticed that the box trailer had been stripped of its VIN and all other identifying markers. When they opened up the trailer, they discovered a red Kawasaki

2

motorcycle inside. The motorcycle was taped with blue painter's tape, in preparation for being painted. The red motorcycle still had its original VIN. When the officers ran the VIN, they learned that the motorcycle was reported stolen on July 2, 2006. Alexander initially expressed surprise that the motorcycle was inside the trailer and claimed that he did not know the motorcycle was inside, but later acknowledged that he had known the motorcycle was inside the trailer, that he was the one who placed the painter's tape on the bike, and that he had planned to paint the bike in preparation for selling it. The officers confiscated the Volvo, the box trailer, and the red Kawasaki.

Detective Spillers testified that, over the course of the next week, Alexander called more than once and gave them various names of people for whom he had supposedly towed the vehicles and offered to show the officers from where he had towed the vehicles. Spillers testified, "We tried to follow-up on some of the leads he gave us as far as the people requesting tows, but they turned out to be dead ends. We finally ended up having to go back on the 7th of August [and] knock on his door to request his records." Alexander was unable to produce business records but, according to Spillers, "[h]e agreed that he was going to come down and give us an interview, and it was our understanding at that time that he would be able to produce standard documentation for operating a tow business, receipts for towing, and people's information as required by statutes."

The next day, Alexander came to the police station and was interviewed by Detectives Spillers and Hightower. The interview was recorded and a video of the interview was admitted into evidence and played for the jury at trial. In the interview, Alexander acknowledged that his tow business was not licensed and his tow truck was not insured, that he did not keep records on his tow jobs, and that he did not request identification or ownership proof from the people for

3

whom he towed vehicles. He initially claimed that he towed the Volvo for a man named Rick Mason, but he could not give the detectives the man's phone number or any way to contact him. Alexander said that Mason asked him to tow the car on July 24, 2006, and to store it overnight. Mason was to come by the next day and go with Alexander to take the car to the Volvo shop. Alexander said he kept the car for two to three weeks, but when Mason did not come back and the storage fees began to accumulate, Alexander decided to sell the car to recoup his costs.[1] Alexander said that he put a sign in the window advertising it for sale and tried to sell it but all the prospective buyers backed out when they learned he did not have title to the car. At some point, according to Alexander, a man named Don King—who Alexander claimed lived in Alexander's neighborhood and whom Alexander said he had known for years but for whom Alexander could not produce valid contact information—offered to buy the car. Alexander told the detectives that, the day after the officers confiscated the Volvo, Rick Mason came looking for his car, but when Alexander tried to contact the police so Mason could speak to them about his car, Mason sped off.

Alexander had a similar story for the trailer and the red motorcycle. He admitted that he had lied to the detectives when he told them that he did not know about the motorcycle because he was concerned about going to jail. He told the detectives that a man named James had requested a tow sometime in early July. He did not have a phone number for James or know James's last name. Alexander claimed to have met James in a Luby's parking lot before following him to an

---

[1] When the detectives pointed out that they confiscated the car only seven days after the July 24 date that Alexander purportedly towed the Volvo, Alexander stated that he definitely had the car for two to three weeks. He told the detectives that the July 24 date must therefore be incorrect, but that he was uncertain what the correct date was, stating only that it was some time after the July 4 holiday.

apartment complex on East Oltorf in Austin. Alexander said he then towed the trailer, with the motorcycle inside, and stored them in his backyard. When the officers asked Alexander what car James was driving, Alexander initially responded that James was in a white Ford truck with tan stripes. When the officers asked Alexander why James had not towed his own trailer and motorcycle, Alexander changed his story and claimed that James's truck was broken down and was sitting in the complex parking lot near the trailer and that James had been driving a Ford Escort. As with the Volvo, Alexander claimed that James never picked up his vehicles, so when someone offered to pay $800 to take the trailer and bike, he agreed. Alexander later said that King offered to buy both the motorcycle and the Volvo.

Detective Hightower then confronted Alexander with proof that Alexander had the white trailer in his yard as early as February 2006 and told Alexander that the motorcycle was stolen on July 10 from the apartment complex from which Alexander claimed to have towed it. Alexander's story then changed completely. Alexander claimed that King brought the bike to Alexander and asked Alexander to hide the bike in the trailer. Alexander said that when King brought the motorcycle over, King saw the Volvo and offered to buy both the car and the bike. When the detectives asked Alexander why King would buy a bike he brought over, Alexander then corrected himself and said King was going to pay Alexander to paint the bike. When they asked Alexander how he knew what complex the motorcycle was stolen from, he claimed that King told him.

Alexander also changed his story regarding the Volvo. He said that he received the Volvo from a man named Chris and claimed to have given Chris an old Chevrolet Caprice in trade.

5

Alexander said that Chris did not have title to the Volvo and did not give him the keys to the car. But Alexander soon changed his story again, saying that he tossed out the keys that Chris gave him. Alexander maintained that he had not switched the Volvo's VIN or license plates, and said that Chris must have done that. Alexander did not know Chris's last name or telephone number, but offered to take the detectives to where Chris worked. He denied having changed the Volvo's VIN and claimed that the Volvo was already "rigged up" when he received it.

Over the course of his interactions with the detectives, Alexander moved from saying he was running a legitimate towing business, to saying he ran an unlicensed business, to saying he "just took the cash and ran" when people requested suspicious tows, to saying he knowingly received stolen items and took steps to conceal their identities. He admitted that he planned to paint the motorcycle so he could sell it and that he planned to either sell the Volvo or dismantle it and sell its parts. Detective Spillers and Hightower both testified that all of the various leads Alexander gave them for where and from whom he had gotten the vehicles were dead ends and that Alexander did not give them any credible leads for who else could have changed the car's VIN.

Alexander was charged with theft of the motorcycle and theft of the Volvo and with changing the VIN on the Volvo. The jury convicted Alexander of all three counts. Each of the indictments also alleged that Alexander had two prior felony convictions, making him an habitual offender. The habitual offender allegations resulted in increased sentencing guidelines. *See* Tex. Penal Code Ann. § 12.42(d) (West Supp. 2008). On appeal, Alexander argues that the evidence was legally and factually insufficient to support the conviction for changing the VIN on the Volvo and that his trial counsel was ineffective because he failed to move to quash the habitual offender portion of the VIN indictment.

6

**DISCUSSION**

**Legal and Factual Sufficiency of the Evidence**

In reviewing the legal sufficiency of the evidence, we review all of the evidence in the light most favorable to the verdict. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The question presented is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *Clayton*, 235 S.W.3d at 778. We assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Clayton*, 235 S.W.3d at 778.

In reviewing the factual sufficiency of the evidence, we consider all the evidence in a neutral light, while giving due deference to the jury's determination. *See Sims v. State*, 99 S.W.3d 600, 601 (Tex. Crim. App. 2003); *Vasquez v. State*, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002). This involves a two-part inquiry. *See Johnson v. State*, 23 S.W.3d 1, 6-7 (Tex. Crim. App. 2000). We first look at the evidence presented in support of the guilty verdict and reverse only if the evidence "is so weak as to be clearly wrong and manifestly unjust." *Id.* at 11. If the evidence that tends to prove the verdict is sufficient standing alone, we then compare it with the evidence the defendant produces against the verdict, *id.* at 7, and reverse only if after the comparison the verdict "is against the great weight and preponderance of the available evidence," *id.* at 11. The jury is the sole judge of the credibility of the witnesses and the weight to be accorded their testimony. *Vasquez*, 67 S.W.3d at 236. We may not reweigh the evidence and substitute our judgment for that of the jury. *Watson v. State*, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006); *King v. State*, 29 S.W.3d 556, 563 (Tex. Crim. App. 2000).

7

In his first and second points of error, Alexander argues that the evidence is legally and factually insufficient to sustain the serial number conviction. Under the transportation code, "[a] person commits an offense if the person stamps or places a serial number on a vehicle or part of a vehicle with the intent of changing the identity of the vehicle." *See* Tex. Transp. Code Ann. § 501.151. Alexander maintains that the State only proved that he was in possession of a vehicle that had a false VIN and not that he personally placed the false VIN on the Volvo. Therefore, according to Alexander, the State's evidence only supports a conviction for tampering with a VIN, which is a class A misdemeanor rather than a felony. *Compare* Tex. Penal Code Ann. § 31.11(a)(2)(A) (West 2003), *with* Tex. Transp. Code Ann. § 501.151; *see also Boudreaux v. State*, 24 S.W.3d 503, 507 (Tex. App.—Texarkana 2000, no pet.) (holding that offense of placing false VIN on vehicle requires proof beyond that necessary to prove tampering offense). While the State did not present any direct evidence that Alexander himself placed the false VIN on the Volvo, it did introduce sufficient circumstantial evidence to allow a reasonable jury to infer that he did so.[2] Specifically, the State introduced evidence that Alexander: (1) attempted to sell the admittedly stolen Volvo, (2) took steps to conceal the identity of other vehicles in his possession, and (3) lied to the police about how he obtained the stolen vehicles.

---

[2] While the evidence could also support an inference that Alexander merely attempted to sell the vehicle knowing it had a false VIN, the job of choosing between these two inferences belongs to the jury, who is tasked with the responsibility "to weigh the evidence, to judge the credibility of the witnesses, and to choose between conflicting theories of the case." *Geesa v. State*, 820 S.W.2d 154, 159 (Tex. Crim. App. 1991). Here, the jury weighed the evidence and was convinced beyond a reasonable doubt that Alexander "placed" the VIN on the Volvo.

*Attempting to Sell the Stolen Volvo*

Alexander admitted to trying to sell the Volvo, which he knew was stolen. In addition, Detective Spillers testified that the tip-line caller told him Alexander advertised the Volvo as a 1980s model Volvo; the incorrect VIN that was placed on the Volvo was from a 1980s model vehicle. From this, a reasonable jury could infer that Alexander knew that the VIN was from a 1980s model because he was the one who placed the false 1980s VIN on the car in order to sell it.

*Altering the Identification of Vehicles in His Possession*

Further, the jury was presented with evidence that Alexander took other steps to alter the stolen vehicles in his possession. Not only had the VIN been changed on the Volvo, but the license plate and inspection sticker had been changed as well. The inspection sticker on the Volvo was from a Toyota and there was an old Toyota sitting in Alexander's yard, from which a reasonable jury could infer that Alexander removed the inspection sticker from the Toyota and placed it on the Volvo. In addition, Alexander admitted to the detectives that he knew the motorcycle was stolen and that he had taken steps to paint it in order to conceal its identity. Alexander also possessed a white trailer from which the VIN and all other identifying markers had been removed. The jury could have concluded that a person who takes these steps to change the identity of vehicles is more likely to change a stolen vehicle's VIN to conceal its identity.

*Lying to the Police*

Finally, the State introduced evidence that Alexander lied to the police about how he obtained the vehicles in order to lessen his culpability. During the taped interview with Detectives

9

Spillers and Hightower, Alexander repeatedly asked the detectives what he needed to do to avoid jail. Each time, the detectives told him he needed to tell them how he obtained the vehicles. In response, Alexander told the detectives several different inconsistent stories, ranging from running a legitimate towing business to knowingly receiving stolen items. Alexander could not provide the detectives with numbers for any of the people from whom he supposedly received the vehicles. Nonetheless, the detectives testified that they attempted to follow up on each of these leads and that all of them were dead ends. The jury could have inferred that Alexander gave the detectives false leads in an attempt to conceal the fact that Alexander himself stole the vehicles. If Alexander stole the Volvo in early July, then it was more likely that he was the only person who had the opportunity to change the VIN.[3] The jury could have further determined that Alexander, who changed his story several times and admitted to lying to the police in order to keep from going to jail, was lying when he told the detectives that he had not changed the VIN.

The combined force of all the circumstantial evidence—including that Alexander advertised the car for sale as a model that matched the incorrect VIN, was in possession of multiple stolen vehicles, took steps to conceal the identity of those vehicles, lied to the police about how he obtained those vehicles, had no business records to support his claim that he ran a towing business, and changed his story multiple times—was sufficient to allow a reasonable jury to conclude beyond a reasonable doubt that Alexander placed the incorrect VIN on the Volvo in order to conceal its

---

[3] The owner of the Volvo testified at trial that her car was stolen in early July. Alexander admitted to having the car for two to three weeks, which is consistent with his having stolen the car in early July and thus being the only person to possess it and have the opportunity to change the VIN.

identity. *See Clayton*, 235 S.W.3d at 778. Therefore, we hold that the evidence is legally sufficient to sustain Alexander's conviction, and we overrule his first point of error.

Likewise, the evidence in support of the guilty verdict is not so weak as to be clearly wrong and manifestly unjust, and Alexander did not produce evidence against the verdict so as to make the guilty verdict against the great weight and preponderance of the available evidence. *See Johnson*, 23 S.W.3d at 6-7, 11. Therefore, we hold that the evidence is factually sufficient to sustain Alexander's conviction, and we overrule his second point of error.

**Ineffective Assistance of Counsel**

In reviewing a claim of ineffective assistance of counsel, we first ask whether an attorney's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Hernandez v. State*, 988 S.W.2d 770, 774 (Tex. Crim. App. 1999). An attorney's performance is deficient if it falls below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687; *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). If the performance was deficient, we ask whether that deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687; *Thompson*, 9 S.W.3d at 812. An attorney's deficient performance is prejudicial when, but for the attorney's unprofessional conduct, there is a reasonable probability that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694.

Alexander argues that his trial counsel's performance was deficient because he failed to move to quash the habitual offender portion of the indictment for the VIN offense and that Alexander was prejudiced when he received a longer sentence as a result. Under section 12.42 of the penal code, an habitual offender is one who "has previously been finally convicted of two felony

11

offenses, and the second previous felony conviction is for an offense that occurred subsequent to the first previous conviction having become final." Tex. Penal Code Ann. § 12.42(d). If a defendant is convicted and is shown to be an habitual offender, his sentence must be between twenty-five and ninety-nine years or life in prison. *Id.* The State must give a defendant notice that it intends to seek enhanced punishment under this section. *Brooks v. State*, 957 S.W.2d 30, 33 (Tex. Crim. App. 1997).

The indictment for the VIN case contained the following enhancement allegations:

And the Grand Jury further presents that previously Dennis Alexander had been convicted of the following felony offenses:

of POCS (COCAINE) on the 20th day of September, 1999, in Cause Number 97-2639 in the 331st Judicial District Court of TRAVIS County, Texas;

of POCS (COCAINE) on the 20th day of September, 1999, in Cause Number 97-0910 in the 331st Judicial District Court of TRAVIS County, Texas;

which convictions had become final before the commission of the [VIN] offense alleged in the preceding paragraph.

And the Grand Jury further presents that previously Dennis Alexander had been convicted of the following felony offenses:

of UUMV on the 30th day of July, 1991, in Cause Number 101,042 in the 331st Judicial District Court of TRAVIS County, Texas;

of AGGRAVATED ASSAULT W/ SERIOUS BODILY INJURY on the 30th day of July, 1991, in Cause Number 99-012 in the 331st Judicial District Court of TRAVIS County, Texas;

which convictions had become final before the commission of the offense alleged against the peace and dignity of the State.

Alexander argues that the indictment was insufficient to allege that he was an habitual offender because it did not specifically allege that he committed the second felony offense after he was finally convicted for the first felony offense, citing to *Gutierrez v. State*, 555 S.W.2d 457 (Tex. Crim. App. 1977), and *Seals v. State*, 634 S.W.2d 899, 906 (Tex. App.—San Antonio 1982, no pet.). He contends that it was conceivable that the conviction for the 1991 offense was not yet final when he committed the 1999 offense. Alexander argues that a motion to quash would therefore have been granted and he would have received a lighter sentence.

The statute clearly requires the State to prove that the first conviction was final before the second offense was committed in order to invoke the habitual offender sentencing guidelines, *see* Tex. Penal Code Ann. § 12.42(d), and the State did so in this case through Alexander's stipulation to that fact. The question presented is whether the State's failure to *allege* this fact in the indictment is a fatal error. We hold that it is not.

While the cases cited by Alexander do appear to state a bright line rule that, in order to invoke the habitual offender statute, the indictment must allege "that each succeeding conviction be subsequent both in point of time of the commission of the offense and the conviction therefor," *see Seals*, 634 S.W.2d at 906, later cases have "moved toward a relaxation of the rigid technical rules of the past" and instead focused on whether the indictment provided sufficient notice or whether the defendant was surprised to his detriment. *Freda v. State*, 704 S.W.2d 41, 43 (Tex. Crim. App. 1986); *see also Williams v. State*, 980 S.W.2d 222, 227 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd).

The question then becomes whether the indictment gave Alexander sufficient notice that the State was invoking the habitual offender statute. The indictment indicated the following

concerning Alexander's prior convictions: cause numbers; district number and county of the court; offense charged and its felony nature; and the date of conviction. This information is sufficient to notify Alexander that he was being charged as an habitual offender. *See Jingles v. State*, 752 S.W.2d 126, 129 (Tex. App.—Houston [14th Dist.] 1987, pet. ref'd). This information enabled Alexander "to find the record and make preparation for a trial of the question whether he is the convict named therein." *See Brown v. State*, 636 S.W.2d 867, 868 (Tex. App.—Fort Worth 1982, no pet.).

Furthermore, Alexander asserted no defense to the enhancement allegation; indeed, he pleaded true to the enhancements and stipulated that the conviction for the 1991 offense became final before he committed the 1999 offense. When a defendant has no defense to an enhancement allegation and makes no suggestion of the need for a continuance in order to prepare a defense, notice given as late as the beginning of the punishment phase is sufficient. *Villescas v. State*, 189 S.W.3d 290, 294 (Tex. Crim. App. 2006); *Mayfield v. State*, 219 S.W.3d 538, 540 (Tex. App.—Texarkana 2007, no pet.).

Alexander has not shown that he was unfairly surprised when the State sought to have his punishment assessed under the habitual offender statute. Because he was not unfairly surprised, the trial court need not have granted a motion to quash had one been made. *See Williams*, 980 S.W.2d at 227. Therefore, Alexander has not shown that a different outcome was likely, as he must prove in order to show he was prejudiced by his trial counsel's failure to make a motion to quash the enhancement portion of the allegation. *See Strickland*, 466 U.S. at 694. As a result, Alexander's claim of ineffective assistance of counsel must fail. We overrule Alexander's third point of error.

14

## CONCLUSION

Because we hold that the evidence was legally and factually sufficient to sustain the conviction for placing a serial number on a vehicle with the intent to change the identity of the vehicle and that Alexander was not prejudiced by ineffective assistance of counsel, we overrule his three points of error and sustain the judgments of conviction.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Puryear and Henson

Affirmed

Filed:   May 1, 2009

Do Not Publish

15